# THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## ASHEVILLE DIVISION
## CIVIL CASE NO. 1:25-cv-00076-MR-WCM

CATHERINE NICHOLSON, )
)
       Plaintiff, )
)
vs. )     <u>MEMORANDUM OF</u>
)     <u>DECISION AND ORDER</u>
)
HCA HEALTHCARE, INC., JAMIE )
GOSNELL, JARED ALLEN, MEGAN )
TIPTON, HEATHER MCFARLAND )
THORP, KRISTEN TILGHMAN, )
CHRISTOPHER BERRY, KELLY )
BRADY, AMANDA CARVER, NINA )
MURCHISON, EVADORA BOYD, )
JENNIFER MCFADDEN, TERI CLARK, )
and CHARLENE ATKINSON, )
)
       Defendants. )
_____ )

**THIS MATTER** is before the Court on Defendant HCA Healthcare,

Inc.'s Motion to Dismiss [Doc. 48], Defendants Jamie Gosnell, Kristen

Tilghman, Christopher Berry, Kelly Brady, Amanda Carver, Jennifer

McFadden, Teri Clark, Charlene Atkinson, and Evadora Boyd's Motion to

Dismiss [Doc. 50], Defendant Heather MacFarland Thorp's Motion to

Dismiss [Doc. 71], and Defendant Nina Murchison's Motion to Dismiss [Doc.

76].

## I. PROCEDURAL HISTORY

On March 12, 2025, the Plaintiff initiated this action by filing a Complaint asserting nine employment discrimination claims and a negligent hiring, retention, and supervision claim against ANC Mission Hospital, Inc. ("Mission") and Defendant HCA Healthcare, Inc. ("HCA"), as well as four tort claims against Defendants Jamie Gosnell, Kristen Tilghman, Christopher Berry, Kelly Brady, Amanda Carver, Jennifer McFadden, Teri Clark, Charlene Atkinson, Evadora Boyd, Heather MacFarland Thorp, Nina Murchison, Jared Allen, and Megan Tipton (collectively, the "Individual Defendants"). [Doc. 1]. After voluntarily dismissing Mission on April 22, 2025, [Doc. 17], the Plaintiff filed a First Amended Complaint on July 29, 2025 asserting the same claims but without Mission as a defendant.

Two of the Individual Defendants—Jared Allen and Megan Tipton—have yet to make an appearance in this matter. On March 26, 2026, almost four months after the Plaintiff's thrice-extended deadline for service, the Plaintiff filed a Certificate of Service by Publication asserting that Defendants Allen and Tipton had been served by March 21, 2026. [Doc. 86]. However, Defendants Allen and Tipton have not filed an Answer, and no motion concerning the timeliness or sufficiency of the Plaintiff's purported service or Defendants Allen and Tipton's lack of response is currently before the Court.

2

HCA and the other eleven Individual Defendants have filed timely motions to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, [Docs. 48, 50, 71, 76], and all four motions have been fully briefed, [Docs. 49, 51, 62, 63, 66, 67, 72, 73, 75, 77, 80, 81]. Accordingly, these motions are ripe for disposition.

## II. STANDARD OF REVIEW

To survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). To be "plausible on its face," a plaintiff must demonstrate "more than a sheer possibility that a defendant has acted unlawfully." Id.

In reviewing the Complaint, the Court must accept the truthfulness of all factual allegations but is not required to assume the truth of "bare legal conclusions." Aziz v. Alcolac, Inc., 658 F.3d 388, 391 (4th Cir. 2011). "The mere recital of elements of a cause of action, supported only by conclusory statements, is not sufficient to survive a motion made pursuant to Rule 12(b)(6)." Walters v. McMahen, 684 F.3d 435, 439 (4th Cir. 2012); see also Iqbal, 556 U.S. at 678 ("A pleading that offers 'labels or conclusions' or 'a

3

formulaic recitation of the elements of a cause of action will not do.'" (quoting Twombly, 550 U.S. at 555)).

Determining whether a complaint states a plausible claim for relief is "a context-specific task," Iqbal, 556 U.S. at 679, which requires the Court to assess whether the factual allegations of the Complaint are sufficient "to raise a right to relief above the speculative level," Twombly, 550 U.S. at 555. As the Fourth Circuit has explained:

> To satisfy this standard a plaintiff need not forecast evidence sufficient to prove the elements of the claim. However, the complaint must allege sufficient facts to establish those elements. Thus, while a plaintiff does not need to demonstrate in a complaint that the right to relief is probable, the complaint must advance the plaintiff's claim across the line from conceivable to plausible.

Walters, 684 F.3d at 439 (citations and internal quotation marks omitted).

## III. FACTUAL BACKGROUND

The allegations set forth in the Complaint, giving the Plaintiff the benefit of all reasonable inferences, show the following.

The Plaintiff is a Registered Nurse who identifies as a Black, White, and Native American woman over the age of 40. [Doc. 19 at ¶ 38]. In 2024, the Plaintiff was an employee of Aya Healthcare, Inc. ("Aya"), and Aya contracted with HCA for the Plaintiff to provide nursing services at Mission for a term of twenty-one weeks, starting on or about February 5, 2024. [Id.

4

at ¶¶ 39-41].  At Mission, the Plaintiff was assigned the responsibilities of a Charge Nurse, which is a leadership position within the hospital's nursing team.  [Id. at ¶ 43].  This litigation arises from alleged discriminatory and tortious conduct suffered by the Plaintiff during the period she was providing nursing services at Mission.  [Id. at ¶¶ 44-70].

Regarding her work schedule and duties, the Plaintiff alleges that throughout her employment she was assigned to work every weekend despite repeated requests for a first-shift schedule.  [Id. at ¶ 44].  The Plaintiff further alleges that her manager, Defendant Gosnell, denied her schedule requests on grounds that first-shift positions were unavailable, but that "newly hired Caucasian employees" were granted first-shift schedules.  [Id. at ¶ 45].  In May 2024, the Plaintiff requested to step down from her duties as Charge Nurse, but Defendant Gosnell denied her request on grounds that the Plaintiff was the only Charge Nurse available on the weekends.  [Id. at ¶ 55].  The Plaintiff subsequently agreed to continue in her role as Charge Nurse.  [Id. at ¶ 56].

Regarding her work environment, the Plaintiff alleges that she encountered "significant resistance" from staff that her "Caucasian counterparts in similar roles" did not face, and that she was "subjected to several incidents of hostility."  [Id. at ¶ 47].  One such incident occurred on

5

or about February 9, 2024, when a fellow employee remarked, in a manner that the Plaintiff perceived as hostile, that the Plaintiff "did not look her age." [Id. at ¶ 48]. The Plaintiff "reported incidents of discrimination and mistreatment" to Defendant Gosnell, but Defendant Gosnell "dismissed her concerns" as arising from a "generational gap." [Id. at ¶¶ 49-50]. The Plaintiff subsequently learned that her private conversations with Defendant Gosnell were being discussed by other staff members, giving the Plaintiff the impression that Defendant Gosnell had disclosed her concerns to other employees. [Id. at ¶¶ 51-52]. Another incident occurred on or about July 19, 2025 [sic], when a patient used a racially derogatory slur while speaking to the Plaintiff, and Defendant Tilghman repeated the patient's statement, including the derogatory slur, to the Plaintiff. [Id. at ¶ 53]. The Plaintiff alleges that she did not file a formal complaint about the incident with Defendant Tilghman because Defendant Gosnell had dismissed her earlier reports. [Id. at ¶ 54].

Additionally, on or about June 14, 2024, the Plaintiff filed a "Vigilance report" regarding the conduct of Defendant Allen on grounds that Allen had left a patient unattended. [Id. at ¶ 57]. After filing this report, the Plaintiff perceived "increased tension" with Defendant Gosnell and "an increase in hostility" from Defendants Allen, Berry, and Tilghman. [Id. at ¶ 58]. One of

the Plaintiff's colleagues subsequently told her that at least eight of the Individual Defendants were "discussing the possibility of removing her from her Charge Nurse duties and had been discussing a plan to sabotage her career." [Id. at ¶ 59].

Finally, on or about July 23, 2024, the Plaintiff was informed that she had been terminated from her position at Mission due to "clinical performance concerns." [Id. at ¶ 60]. On July 24, 2024, the Plaintiff received notice that a complaint had been filed with the North Carolina State Board of Nursing ("Nursing Board") alleging that she had an inappropriate verbal interaction with a patient on or about July 21, 2024. [Id. at ¶ 61]. The Plaintiff alleges that the Individual Defendants fabricated the basis for the Nursing Board complaint, erased or altered exculpatory camera footage of the patient interaction at issue, and submitted the complaint. [Id. at ¶ 62]. Upon investigation of the complaint by the Nursing Board, the Plaintiff was found not to be at fault, and the complaint was dismissed. [Id. at 63].

## IV. DISCUSSION

### A. Employment Discrimination Claims against HCA

The Plaintiff's nine employment discrimination claims against HCA can be grouped into three categories, each of which contains three claims. The three categories are: harassment and discrimination creating a hostile work

environment (Claims 1-3); retaliation and wrongful termination (Claims 4-6); and disparate treatment (Claims 7-9).  Each category contains three virtually identical claims, except that each claim arises under a different statute: Title VII of the Civil Rights Act (Claims 1, 4, 7); the Age Discrimination in Employment Act (Claims 2, 5, 8); and the North Carolina Equal Employment Practices Act (Claims, 3, 6, 9).  HCA has moved to dismiss all nine claims solely on the ground that the Plaintiff has not adequately pled that HCA was the Plaintiff's "employer," as defined by Title VII of the Civil Rights Act ("Title VII"), the Age Discrimination in Employment Act ("ADEA"), and the North Carolina Equal Employment Practices Act ("NCEEPA").  [Doc. 49 at 6].

The Plaintiff alleges that at the time of the conduct alleged in the First Amended Complaint she was "a direct employee of Aya Healthcare, Inc." [Doc. 19 at ¶ 39].  However, the Plaintiff also alleges that HCA was her "temporary employer" because she was a "temporary 'employee' of Mission Hospital," and HCA "owns, operates, and manages" Mission.  [Id. at ¶¶ 12-14].

In the Title VII and ADEA contexts, the Fourth Circuit has adopted the "joint employment doctrine," under which "multiple entities could be employers of a plaintiff," to "prevent[ ] those who effectively employ a worker from evading liability by hiding behind another entity, such as a staffing

agency." <u>Butler v. Drive Auto. Indus. of Am., Inc.</u>, 793 F.3d 404, 409 (4th Cir. 2015); <u>see also</u> <u>Haavistola v. Cmty. Fire Co. of Rising Sun</u>, 6 F.3d 211, 219 n.2 (4th Cir. 1993) ("[T]he operative language in ADEA is identical to the operative language in Title VII, so the analysis utilized under either act is interchangeable."). Because the North Carolina Supreme Court has "explicitly adopted" Title VII standards and principles of law in the context of discrimination claims, the Court will also apply the Fourth Circuit's joint employment doctrine to the Plaintiff's NCEEPA claims.[1] <u>See</u> <u>Johnson v. Crossroads Ford, Inc.</u>, 230 N.C. App. 103, 111, 749 S.E.2d 102, 108 (2013); <u>see also</u> [Doc. 49 at 7 n.3; Doc. 62 at 2].

---

[1] The Court notes, however, that the "plaintiff has cited no authority showing that a private cause of action exists under the [NCEEPA]." <u>Bendross v. Town of Huntersville</u>, 159 N.C. App. 228, 582 S.E.2d 726 (2003). The Fourth Circuit has held that "[n]either the North Carolina Supreme Court nor the North Carolina Court of Appeals has recognized a private cause of action under the NCEEPA." <u>Smith v. First Union Nat. Bank</u>, 202 F.3d 234, 247 (4th Cir. 2000). Instead, "[i]n enacting the Equal Employment Practices Act, the North Carolina legislature chose not to provide any remedies beyond those available under federal discrimination statutes." <u>Percell v. Int'l Bus. Machines, Inc.</u>, 765 F. Supp. 297, 302 (E.D.N.C. 1991), <u>aff'd sub nom.</u> <u>Percell v. Int'l Bus. Machines Corp.</u>, 23 F.3d 402 (4th Cir. 1994). Courts have subsequently disagreed as to whether NCEEPA should be interpreted as establishing legislative recognition of common-law wrongful discharge claims in North Carolina, and if so, the scope of such claims. <u>See, e.g.</u>, <u>Efird v. Riley</u>, 342 F. Supp. 2d 413, 428 (M.D.N.C. 2004) (interpreting NCEEPA and concluding that North Carolina recognizes "a claim for wrongful discharge in violation of public policy based on allegations that a plaintiff was fired because of her sex" but that North Carolina does not recognize a claim for "wrongful discharge based on retaliatory discharge for complaints about sex discrimination"). However, because HCA has moved to dismiss the Plaintiff's employment discrimination claims solely on the grounds that it cannot be held liable as the Plaintiff's employer, the Court need not address the merits of the discrimination claims, including this issue concerning NCEEPA, at this time.

9

In <u>Butler</u>, the Fourth Circuit articulated a set of nine factors for courts to use when applying the joint employment doctrine:

> (1) authority to hire and fire the individual;
> (2) day-to-day supervision of the individual, including employee discipline;
> (3) whether the putative employer furnishes the equipment used and the place of work;
> (4) possession of and responsibility over the individual's employment records, including payroll, insurance, and taxes;
> (5) the length of time during which the individual has worked for the putative employer;
> (6) whether the putative employer provides the individual with formal or informal training;
> (7) whether the individual's duties are akin to a regular employee's duties;
> (8) whether the individual is assigned solely to the putative employer; and
> (9) whether the individual and putative employer intended to enter into an employment relationship.

<u>Butler</u>, 793 F.3d at 414. Although "none of these factors are dispositive," the first three factors are "the most important," and "the common-law element of control remains the 'principal guidepost' in the analysis." <u>Id.</u> The ultimate question is "whether a putative employer exercise[s] significant control" over the individual. <u>Id.</u> at 410.

Here, several key factors weigh in favor of the Plaintiff. The Plaintiff's allegations indicate that HCA was responsible for the day-to-day supervision of her work. Her manager, Defendant Gosnell, was an HCA employee, and Gosnell determined the Plaintiff's work schedule and fielded her complaints

10

about her work environment at Mission.  [Doc. 19 at ¶¶ 44-45, 49-50, 54-56, 58].  Moreover, as a Charge Nurse, the Plaintiff held "a leadership position within Mission Hospital's nursing team," and she was responsible for providing instructions to other HCA employees.  [Id. at ¶¶ 43, 47].  As a result, the Plaintiff appears to have been integrated into Mission's nursing team and performed duties akin to those of regular HCA employees.  Therefore, although the Plaintiff has not alleged facts regarding several of the relevant factors, the Plaintiff has alleged sufficient facts for the Court to conclude at this early stage in the litigation that HCA may qualify as her employer.[2]  Accordingly, the Court will deny HCA's motion to dismiss as to the Plaintiff's first nine causes of action in the First Amended Complaint.

### B.    Tort Claims Against the Individual Defendants

The Plaintiff has asserted four tort claims against each Individual Defendant: (1) defamation per se; (2) civil conspiracy; (3) intentional infliction

---

[2] The parties dispute whether the Plaintiff has alleged that HCA had the authority to fire the Plaintiff, and none of the Plaintiff's allegations regarding her termination states *who* terminated her.  See [Doc. 49 at 11; Doc. 62 at 5; Doc 66 at 3].  However, in the context of the Plaintiff's negligent hiring, retention, and supervision claim, taking the allegations in the light most favorable to the Plaintiff, HCA was responsible for her termination.  [Doc. 19 at ¶ 222 (characterizing HCA's conduct as "failure to address Plaintiff's concerns regarding discriminatory behavior and *its subsequent termination* of Plaintiff" (emphasis added))].  Because this allegation implies that HCA was responsible for terminating the Plaintiff, the joint employment factor concerning the authority to fire the Plaintiff also supports a conclusion, at this stage, that HCA may qualify as the Plaintiff's employer.

of emotional distress ("IIED"); and (4) negligent infliction of emotional distress ("NIED").

### 1. Defamation Per Se

"To be actionable, a defamatory statement must be false and must be communicated to a person or persons other than the person defamed." Andrews v. Elliot, 109 N.C. App. 271, 274, 426 S.E.2d 430, 432 (1993). An actionable defamatory statement that "tends to impeach a person in that person's trade or profession" may be defamatory per se. Boyce & Isley, PLLC v. Cooper, 153 N.C. App. 25, 29, 568 S.E.2d 893, 898 (2002). To state a plausible claim for defamation per se, "[t]he alleged defamatory statement or statements made or published by the defendant need not be set out verbatim in plaintiff's defamation complaint if alleged substantially *in haec verba,* or with sufficient particularity to enable the court to determine whether the statement was defamatory." Andrews, 109 N.C. App. at 274, 426 S.E.2d at 432; see also King v. Chaffin, 759 F. Supp. 3d 690, 695 (W.D.N.C. 2024). Because defamation claims are not subject to a heightened pleading standard, the key consideration on a motion to dismiss pursuant to Rule 12(b)(6) is whether the Plaintiff's allegations are "sufficient to give the defendant fair notice of what the plaintiff's claim is and the grounds upon

which it rests."  Hatfill v. New York Times Co., 416 F.3d 320, 329 (4th Cir. 2005) (internal quotation marks omitted).

Here, the Plaintiff's defamation claim is predicated on allegations that the Individual Defendants communicated false statements about the Plaintiff, including allegations of patient abuse, to the Nursing Board.  [Doc. 19 at ¶¶ 189-93].  Although the Plaintiff does not allege the precise content or timing of the statements at issue, she does identify the basis of her defamation claim with sufficient particularity: the claim arises from statements about a physical and verbal interaction between the Plaintiff and a patient on or around July 21, 2024, as well as related statements regarding patient abuse by the Plaintiff, that were communicated to the Nursing Board pursuant to a Nursing Board complaint against the Plaintiff.[3]  [Id. at ¶¶ 60-61, 190-91]; see also [Doc. 63 at 6].  As a result, the Plaintiff's allegations put the Individual Defendants "on notice of the crux of plaintiff's grievance and the facts [they] will be required to address during discovery."[4]  Collins v. AB

---

[3] While the Individual Defendants note that such Nursing Board complaints are typically privileged, the relevant statutory privilege contains an exception for circumstances where the persons making the report "knew the report was false or acted in reckless disregard of whether the report was false."  N.C. Gen. Stat. § 90-171.47; see also [Doc. 51 at 12-13].  The Plaintiff's allegation that the Individual Defendants fabricated the basis for the Nursing Board complaint is sufficient to allege that the Individual Defendants knew the report was false and thus trigger the exception to the privilege.  [Doc. 19 at ¶¶ 61-63].

[4] The Plaintiff's allegations are inconsistent regarding who made and communicated the statements: she first asserts that "several individually named Defendants deliberately and

<u>Biodisk N. Am., Inc.</u>, No. 5:08-CV-355-H, 2009 WL 10705350, at *6 (E.D.N.C. Mar. 16, 2009).  Accordingly, the Court will deny the Individual Defendants' motions to dismiss as to the Plaintiff's claim for defamation per se.

### 2. Civil Conspiracy

"North Carolina courts do not recognize an independent cause of action for civil conspiracy."  <u>Mason v. Health Mgmt. Assocs., LLC</u>, 421 F. Supp. 3d 237, 248 (W.D.N.C. 2019).  Instead, "[a] cause of action for a civil conspiracy under North Carolina law is really an action for damages caused by acts in furtherance of the conspiracy and not for the conspiracy itself." <u>Jackson v. Blue Dolphin Commc'ns of N. Carolina, L.L.C.</u>, 226 F. Supp. 2d 785, 791 (W.D.N.C. 2002).  A civil conspiracy claim, therefore, "is premised on the underlying act."  <u>Piraino Bros., LLC v. Atl. Fin. Grp., Inc.</u>, 211 N.C. App. 343, 350, 712 S.E.2d 328, 333 (2011) (internal quotation marks omitted).  "The charge of conspiracy itself does nothing more than associate the defendants together and perhaps liberalize the rules of evidence to the extent that under proper circumstances the acts and conduct of one might be admissible against all."  <u>Shope v. Boyer</u>, 268 N.C. 401, 405, 150 S.E.2d 771, 774 (1966).

---

falsely accused Plaintiff of patient abuse," [Doc. 19 at ¶ 61 (emphasis added)], but she later asserts that *all* the Individual Defendants were responsible for the statements, [<u>id.</u> at ¶¶ 190-91, 193].  This inconsistency may also be addressed during discovery.

14

The North Carolina Supreme Court has held that "a complaint sufficiently stated a claim for civil conspiracy when it alleged (1) a conspiracy, (2) wrongful acts done by certain of the alleged conspirators in furtherance of that conspiracy, and (3) injury as a result of that conspiracy." State ex rel. Cooper v. Ridgeway Brands Mfg., LLC, 362 N.C. 431, 444, 666 S.E.2d 107, 115 (2008). When the alleged conspirators are all members of a single corporation, a civil conspiracy claim may be barred by the intra-corporate immunity rule, which "provides that, because at least two persons must be present to form a conspiracy, a corporation cannot conspire with itself, just as an individual cannot conspire with himself." Seguro-Suarez by & through Connette v. Key Risk Ins. Co., 261 N.C. App. 200, 218, 819 S.E.2d 741, 754 (2018) (internal quotation marks omitted). The Fourth Circuit has recognized, however, that an exception to the intra-corporate immunity rule may apply if the alleged conspirators possess motives independent of their employer or the alleged conspiratorial acts were taken outside the scope of the alleged conspirators' employment. Painter's Mill Grille, LLC v. Brown, 716 F.3d 342, 353 (4th Cir.2013); see also Seguro-Suarez, 261 N.C. App. at 218 n.6, 819 S.E.2d at 755 n.6.

Here, the Plaintiff alleges that she was "informed by a colleague" that at least eight of the Individual Defendants "had been discussing a plan to

15

sabotage Plaintiff's career." [Doc. 19 at ¶ 59]. The Plaintiff further alleges that the Individual Defendants' plan was "directly related to Plaintiff filing the Vigilance report against Defendant Jared Allen and raising concerns about discriminatory treatment" by the Individual Defendants, thereby giving the Individual Defendants a distinct motive for their actions. [Id.]. Finally, the Plaintiff alleges that the Individual Defendants put their plan into action by filing a false complaint against her with the Nursing Board in order to damage her reputation and career. [Id. at ¶¶ 61-63]. While the Plaintiff's allegations border on speculative and conclusory, they provide just enough particularity to advance the Plaintiff's claim from conceivable to plausible. Accordingly, the Court will deny the Individual Defendants' motions to dismiss as to the Plaintiff's claim for civil conspiracy.

### 3. Intentional Infliction of Emotional Distress

"To state a claim for intentional infliction of emotional distress, a plaintiff must allege: (1) extreme and outrageous conduct (2) which is intended to cause and does cause (3) severe emotional distress to another." Clark v. Clark, 280 N.C. App. 403, 414, 867 S.E.2d 704, 715 (2021) (internal quotation marks omitted). As to the first element, the plaintiff must allege "conduct that is so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious,

16

and utterly intolerable in a civilized community." Id. (internal quotation marks omitted). As to the third element, "severe emotional distress means any emotional or mental disorder . . . which may be generally recognized and diagnosed by professionals trained to do so." Id. at 414-415, 867 S.E.2d at 715 (internal quotation marks omitted). "Whether conduct meets this standard is a question of law." Bratcher v. Pharm. Prod. Dev., Inc., 545 F. Supp. 2d 533, 544 (E.D.N.C. 2008).

"North Carolina courts have been extremely reluctant to find actionable IIED claims in the employment context, and termination, allegedly in violation of federal law alone, does not necessarily constitute extreme and outrageous conduct under North Carolina law." Efird v. Riley, 342 F. Supp. 2d 413, 427 (M.D.N.C. 2004). Moreover, "acts of discrimination are not necessarily extreme and outrageous." Id. (internal quotation marks omitted). For example, when a defendant "threatened to make accusations" against a plaintiff, "threw a package of papers" at her, and "filed a complaint of sexual harassment" against her, the North Carolina Court of Appeals concluded that the "defendant's behavior was undeniably churlish and ill-mannered" but did not "rise to the level of the extreme and outrageous conduct which is required to sustain a claim for intentional infliction of emotional distress." Smith-Price v. Charter Behav. Health Sys., 164 N.C. App. 349, 355, 595 S.E.2d 778, 783

17

(2004). "Subjecting an employee to internal investigations and disciplinary actions, even coupled with alleged discriminatory treatment and strained working relationships, does not constitute extreme and outrageous conduct under North Carolina law." Stephenson v. Carolina Physicians Network Inc., No. 3:21-CV-103-FDW-DCK, 2021 WL 4558198, at *4 (W.D.N.C. Oct. 5, 2021).

Here, the Plaintiff alleges that she was subjected to discriminatory treatment and that the Individual Defendants fabricated allegations of patient abuse against her. Nevertheless, accepting the factual allegations as true and drawing all reasonable inferences in the Plaintiff's favor, the Plaintiff's allegations fall short of the high standard for extreme and outrageous conduct that is required to state an IIED claim under North Carolina law. Accordingly, the Court will grant the Individual Defendants' motions to dismiss as to the Plaintiff's IIED claim.

### 4. Negligent Infliction of Emotional Distress

"To state a claim for negligent infliction of emotional distress under North Carolina law, the plaintiff need only allege that: (1) the defendant negligently engaged in conduct, (2) it was reasonably foreseeable that such conduct would cause the plaintiff severe emotional distress, and (3) the conduct did in fact cause the plaintiff severe emotional distress." Demarco

18

v. Charlotte-Mecklenburg Hosp. Auth., 268 N.C. App. 334, 342, 836 S.E.2d 322, 328 (2019) (internal quotation marks omitted). Regarding the first element, the Fourth Circuit has held that the allegations must specifically implicate negligent conduct: when "the material factual allegations charge nothing but intentional acts . . . [the court] must conclude that they do not state a claim for negligent infliction of emotional distress." Mitchell v. Lydall, Inc., 1994 WL 38703, at *3 (4th Cir. 1994) (per curiam). Therefore, when the only acts a plaintiff alleges to support an NIED claim are the "same *intentional* acts" the plaintiff alleges to support an IIED claim, the plaintiff's NIED claim may be "subject to dismissal." Bonham v. Wolf Creek Acad., 767 F. Supp. 2d 558, 573 (W.D.N.C. 2011) (emphasis in original) (concluding that "[t]his manner of pleading negligent infliction has long been held to be insufficient").

Here, the only acts the Plaintiff alleges in support of her NIED claim are identical to those she alleges in support of her IIED claim. Compare [Doc. 19 at ¶ 206 (alleging intentional conduct that was "extreme and outrageous" in support of IIED claim)], with [id. at ¶ 212 (repeating ¶ 206 verbatim except for replacing "extreme and outrageous" with "negligent")]. Moreover, in the paragraph in the Plaintiff's First Amended Complaint that alleges conduct in support of her NIED claim, the Plaintiff alleges that all

19

such conduct was performed "with the *intent* to harm Plaintiff's reputation and career."  [Id. at ¶ 212 (emphasis added)].   Such intentional conduct cannot sustain the Plaintiff's NIED claim.  Accordingly, the Court will grant the Individual Defendants' motions to dismiss as to the Plaintiff's NIED claim.

### C.   Negligent, Hiring, Retention and Supervision Claim

To state a claim for negligent hiring, retention, and supervision, a plaintiff must allege:

> (1) the specific negligent act on which the action is founded . . . (2) incompetency, by inherent unfitness or previous specific acts of negligence, from which incompetency may be inferred; and (3) either actual notice to the master of such unfitness or bad habits, or constructive notice, by showing that the master could have known the facts had he used ordinary care in oversight and supervision, . . .; and (4) that the injury complained of resulted from the incompetency proved.

Turpin v. Charlotte Latin Schs., Inc., 293 N.C. App. 330, 353, 900 S.E.2d 352, 369–70 (2024) (quoting Medlin v. Bass, 327 N.C. 587, 591, 398 S.E.2d 460, 462 (1990)) (internal quotation marks omitted).  North Carolina courts have "recognized incompetency where employment or retention of employment is dangerous to others, by previous specific acts of careless or negligent conduct, or by inherent unfitness," but  "allegations of 'animus' or 'hostility' alone are insufficient to prove negligence by the employee, inherent

20

unfitness, or that retention of the employee is dangerous to others.  Id. at 354, 900 S.E.2d at 370.  Instead, the Plaintiff must allege that an "incompetent employee committed a tortious act resulting in injury to plaintiff and that prior to the act, the employer knew or had reason to know of the employee's incompetency."  Hogan v. Forsyth Country Club Co., 79 N.C. App. 483, 495, 340 S.E.2d 116, 124 (1986).

Here, the Plaintiff contends that her negligent hiring, retention, and supervision claim is predicated on the tortious act of wrongful discharge. [Doc. 62 at 5-7].  Wrongful discharge, however, "is a tort committed against [a] plaintiff by her *employer*, rather than employees."  Whitfield v. DLP Wilson Med. Ctr., LLC, 482 F. Supp. 3d 485, 494 (E.D.N.C. 2020) (emphasis added) (rejecting negligent supervision and retention claim based on wrongful discharge because such discharge involves "not alleged tortious conduct of employees, but defendant as employer").  Moreover, to the extent the alleged wrongful discharge is attributable to an HCA employee, the Plaintiff has presented no material factual allegations regarding who was responsible for her discharge, whether the employee responsible for her discharge was incompetent, or whether HCA knew or had reason to know of that employee's incompetence.  Therefore, the Plaintiff has failed to state a plausible claim for negligent hiring, retention, and supervision claim predicated on her

21

alleged wrongful discharge. The Plaintiff makes additional general and conclusory allegations to the effect that HCA "knew or should have known" about its employees' alleged discriminatory treatment of the Plaintiff. [Doc. 19 at ¶¶ 223-27]. However, the Plaintiff also alleges that Defendant Gosnell's dismissals of her concerns about mistreatment were *intentional*, not negligent, [id. at ¶ 51], and she does not offer any other material factual allegations regarding how HCA would know about her concerns. Accordingly, the Court will grant HCA's motion to dismiss as to the Plaintiff's negligent hiring, retention, and supervision claim.

## V.      CONCLUSION

At this early stage in the litigation, the Plaintiff has sufficiently alleged that HCA may qualify as her employer, and she has identified the basis of her defamation and civil conspiracy claims with sufficient particularity. Accordingly, the Court will allow the Plaintiff's claims for employment discrimination, defamation per se, and civil conspiracy to proceed. The Plaintiff's claims for NIED, IIED, and negligent hiring, retention, and supervision will be dismissed.

## O R D E R

**IT IS, THEREFORE, ORDERED** that Defendant HCA's Motion to Dismiss [Doc. 48] is hereby **GRANTED IN PART** and **DENIED IN PART**.

The motion is **GRANTED** as to the Plaintiff's negligent hiring, retention, and supervision claim. The motion is otherwise **DENIED**.

**IT IS FURTHER ORDERED** that Defendants Jamie Gosnell, Kristen Tilghman, Christopher Berry, Kelly Brady, Amanda Carver, Jennifer McFadden, Teri Clark, Charlene Atkinson, and Evadora Boyd's Motion to Dismiss [Doc. 50] is hereby **GRANTED IN PART** and **DENIED IN PART**. The motion is **GRANTED** as to the Plaintiff's IIED and NIED claims. The motion is otherwise **DENIED**.

**IT IS FURTHER ORDERED** that Defendant Heather MacFarland Thorp's Motion to Dismiss [Doc. 71] hereby **GRANTED IN PART** and **DENIED IN PART**. The motion is **GRANTED** as to the Plaintiff's IIED and NIED claims. The motion is otherwise **DENIED**.

**IT IS FURTHER ORDERED** that Defendant Nina Murchison's Motion to Dismiss [Doc. 76] is hereby **GRANTED IN PART** and **DENIED IN PART**. The motion is **GRANTED** as to the Plaintiff's IIED and NIED claims. The motion is otherwise **DENIED**.

**IT IS SO ORDERED**.

Signed: June 2, 2026

Martin Reidinger
Chief United States District Judge

23